UTAH POWER & LIGHT CO. v. UNITED STATES.

UNITED STATES v. UTAH POWER & LIGHT CO.

(Circuit Court of Appeals, Eighth Circuit. November 24, 1915.)

Nos. 4506, 4507.

1. WATERS AND WATER COURSES ☞4—PUBLIC LANDS—ACQUISITION OF WATER RIGHTS—ELECTRIC POWER COMPANIES.

Act May 11, 1898, c. 292, § 2, 30 Stat. 404 (Comp. St. 1913, § 4938), providing that rights of way acquired over public lands under Act March 3, 1891, c. 561, §§ 18–21, 26 Stat. 1101 (Comp. St. 1913, §§ 4934–4937), by irrigation companies for canals and ditches may be used for water transportation "for the development of power as subsidiary to the main purpose of irrigation," did not supersede or in any way affect Act May 14, 1896, c. 179, § 2, 29 Stat. 120 (Comp. St. 1913, § 4944), which requires the consent of the Secretary of the Interior to the acquiring by power companies of rights in public lands or forest reservations for the purpose of generating, manufacturing, or distributing electric power.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 1; Dec. Dig. ☞4.]

2. WATERS AND WATER COURSES ☞5—FOREST RESERVATIONS—ACQUISITION OF WATER RIGHTS.

Act Feb. 1, 1905, c. 288, § 4, 33 Stat. 628 (Comp. St. 1913, § 4947), granting rights of way for dams, reservoirs, etc., in forest reserves "for municipal or mining purposes * * * under such rules and regulations as may be prescribed by the Secretary of the Interior," is to be construed in connection with prior acts in pari materia, and rights thereunder can only be acquired under such reasonable rules and regulations as may be prescribed by the Secretary, who is clearly authorized to impose conditions on the grant. Such act conferred no rights upon a power com-

pany which, prior to its passage, had as a trespasser and without right entered upon public lands later included in a forest reservation, appropriated water therefrom, and constructed thereon its electrical plant.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. ☞5.]

**3.** EMINENT DOMAIN ☞46—PUBLIC LANDS—AUTHORITY AND CONTROL OF CONGRESS—ACQUISITION OF PRIVATE RIGHTS.

Under Const. U. S. art. 4, § 3, vesting in Congress power to dispose of and make all needful rules and regulations respecting the property belonging to the United States, and the express provisions of the Enabling Act and Constitution of Utah, disclaiming on the part of the people of the state all right and title to the unappropriated public lands of the United States therein, and providing that until its title is extinguished such lands shall remain subject to the disposition of the United States, private rights in such lands cannot be acquired under the state's power of eminent domain, but only by virtue of some act of Congress.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 91–93; Dec. Dig. ☞46.]

**4.** ESTOPPEL ☞62(2)—UNITED STATES—UNAUTHORIZED APPROPRIATION OF PUBLIC LANDS.

The doctrine of equitable estoppel cannot be invoked against the United States, so far as to validate the unauthorized appropriation of public lands on the mere ground of occupation and improvements made and the presumption that the United States had knowledge thereof.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. § 152; Dec. Dig. ☞62(2).]

**5.** PUBLIC LANDS ☞8—UNLAWFUL USE—RECOVERY OF DAMAGES.

On recovery by the United States of public lands unlawfully appropriated to private use, but the right to which use could have been acquired under the statutes by complying with the regulations and conditions prescribed by the Secretary of the Interior and paying for the same, the United States is entitled to recover as damages the reasonable value of such use by defendant.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 8, 148; Dec. Dig. ☞8.]

Appeal from the District Court of the United States for the District of Utah; J. A. Marshall, Judge.

Suit in equity by the United States against the Utah Power & Light Company. Decree for complainant, and both parties appeal. Affirmed on defendant's appeal, and reversed on the appeal of the United States.

See, also, 208 Fed. 821; 209 Fed. 554, 126 C. C. A. 376.

William W. Ray, U. S. Atty., of Salt Lake City, Utah, and J. F. Lawson, Asst. Sol. for Department of Agriculture, of Ogden, Utah, for the United States.

Graham Sumner, of New York City (R. A. Wilbur, of Salt Lake City, Utah, on the brief), for the defendant.

Before CARLAND, Circuit Judge, and AMIDON and VAN VALKENBURGH, District Judges.

VAN VALKENBURGH, District Judge. This case comes before us for the second time. The United States brought its bill of complaint against the Utah Power & Light Company, defendant below, by which it sought perpetually to enjoin said defendant from main-

taining, in whole or in part, an alleged unlawful and tortious possession and occupancy of certain public lands in Cache county, state of Utah, now forming a part of the Cache National Forest, and also prayed that the defendant be compelled to account for and make corresponding pecuniary payment therefor to the plaintiff.

Appellee is a corporation organized for the purpose of supplying electrical power to all who may desire to purchase and use it. Since December, 1900, it, and its predecessor in interest, have been engaged in the continuous operation of certain hydro-electrical power works, situated on the Logan river in the county and state aforesaid. These works comprise a reservoir and a flume or conduit for conveying the flow of water from the reservoir to the power works, pressure pipes, and power house station, all equipped with the necessary machinery and apparatus. The reservoir, flume, and conduit are situated wholly upon and within the lands of the United States. Appellee claimed to have acquired whatever rights it possessed under and by virtue of the customs, laws, and decisions of the state of Utah, as recognized and confirmed by section 9 of the act of Congress of July 26, 1866 (14 Stat. 253, c. 262), appearing as section 2339 of the Revised Statutes (U. S. Comp. St. 1913, § 4647). In opposition to this the government claimed that Congress has since made specific and comprehensive provisions defining the procedure by which, and the extent to which, the use of the public lands may be granted and acquired for the purposes of generating, manufacturing, and distributing electric power; that this legislation withdraws such uses from the terms of section 2339 of the Revised Statutes. The legislation referred to is that of May 14, 1896 (29 Stat. 120, c. 179 [U. S. Comp. St. 1913, § 4944]). A motion to dismiss, substituted under the new equity rules for demurrer, was filed by appellee. This motion was sustained by the trial court, which entered a decree dismissing the bill. 208 Fed. 821. Upon appeal, the decree below was reversed and the case was remanded for further proceedings in accordance with the views expressed in the opinion of this court. 209 Fed. 554, 126 C. C. A. 376. Thereupon, in the district court, the defendant filed an answer denying some of the allegations of the bill of complaint, and alleging new matter which it conceived to disclose an equitable defense. The government interposed a motion to strike this answer from the files, and for a decree against the defendant upon the ground that the answer and each separate defense stated therein were insufficient in law. This motion was sustained. Title to the lands in question was adjudged and decreed to be quieted and confirmed in the United States as against all claims, demands and contentions of the defendant. From this decree the defendant below appeals. The trial court, however, refused to decree an accounting and damages, as prayed for in the bill, and from this action the government has taken a cross-appeal.

Counsel for the Utah Power & Light Company, which, for convenience, will hereinafter be designated as the defendant, now contend:

(1) That whatever may have been the effect of the act of 1896, upon the law theretofore existing, nevertheless the act of 1898, superseded the act of 1896 and reinstated sections 2339 and 2340 of the Revised

Statutes (Comp. St. 1913, §§ 4647, 4648) with respect to rights of ways for canals and reservoirs for the generation of electric power.

(2) That defendant's predecessors acquired an express grant of rights of way for the reservoir and flume or conduit under section 4 of the act of 1905 (Comp. St. 1913, § 4947).

(3) That the land of the plaintiff (United States of America) within the state of Utah is subject to the laws of that state, and its power of eminent domain to take and use property for a public purpose; that the laws of the state of Utah authorized the defendant and its predecessors to construct and maintain the reservoir and flume or conduit upon the plaintiff's land for a public purpose, and the federal Congress had no power by the act of 1896, or any other act, to withdraw its land from the operation of such laws or to prevent the construction or maintenance of such reservoir, flume or conduit.

(4) That new facts alleged in the answer constitute a defense in the nature of equitable estoppel against the plaintiff.

Defendant also reasserts that the act of Congress of 1896 was not intended to supersede or modify sections 2339 and 2340 of the Revised Statutes, nor displace the laws of the state of Utah, nor prevent the construction or maintenance of reservoirs or water conduits upon the public land. Counsel announced, however, that they would not reargue, on this appeal, any points decided on the former appeal, and inasmuch as we are satisfied with the conclusions there reached, neither time nor space will be consumed in unnecessary re-statement of the views heretofore announced. A fuller discussion of the facts and principles involved in the issues presented on the last appeal will be found in the reported opinion above cited. The points now urged by defendant will be considered in the order of their statement.

[1] 1. That the act of May 11, 1898, superseded the act of 1896 and reinstated sections 2339 and 2340 with respect to rights of way for canals and reservoirs for the generation of electric power. This act of 1898 provided that the act entitled "An act to amend an act to permit the use of the right of way through public lands for tramroads, canals, and reservoirs, and for other purposes," approved January 21, 1895, be amended by adding thereto the following two sections:

"That the Secretary of the Interior be, and hereby is, authorized and empowered, under general regulations to be fixed by him, to permit the use of right of way upon the public lands of the United States, not within the limits of any park, forest, military, or Indian reservations, for tramways, canals, or reservoirs, to the extent of the ground occupied by the water of the canals and reservoirs, and fifty feet on each side of the marginal limits thereof, or fifty feet on each side of the center line of the tramroad, by any citizen or association of citizens of the United States, for the purposes of furnishing water for domestic, public, and other beneficial uses. [Comp. St. 1913, § 4943.]

"Sec. 2. That the rights of way for ditches, canals, or reservoirs heretofore or hereafter approved under the provisions of sections eighteen, nineteen, twenty, and twenty-one of the act entitled 'An act to repeal timber-culture laws, and for other purposes,' approved March third, eighteen hundred and ninety-one, may be used for purposes of a public nature; and said rights of way may be used for purposes of water transportation, for domestic purposes, or for the development of power, as subsidiary to the main purpose of irrigation." 30 Stat. 404 (Comp. St. 1913, § 4938).

It will be observed that the first of these sections affects only lands not within the limits of any park, forest, military, or Indian reservations. It authorizes a mere permission by the Secretary of the Interior, and obviously adds nothing to the power conferred by the act of 1896, which, in express terms, permits rights of way for the purposes of generating, manufacturing or distributing electric power. The second section is, in effect, amendatory of the act of 1891. That act, confessedly, was restricted to purposes of irrigation and dealt only with rights of way over the public lands to be used for such purposes. It was uniformly held that locations under it could not be approved where it appeared that the right of way was desired for any other purpose than irrigation, and, by its terms, the grant was limited "to any canal or ditch company formed for the purpose of irrigation." 18 L. D. 573; 20 L. D. 154; 21 L. D. 63; 28 L. D. 474–476. In the latter decision, Mr. Justice Van Devanter, then Assistant Attorney General to the Secretary of the Interior, rendered an opinion in which he says:

"The act of May 11, 1898, purports to be an amendment of the act of 1895, and section 1 relates only to the public lands not within the limits of any reservation. Section 2 is in effect amendatory of the act of 1891, and relates to all lands coming within the purview of that act, which embraced both public lands and reservations of the United States. It provides that the rights of way granted under the act of 1891 may be used for purposes of a public nature and for water transportation, domestic purposes and for the development of power. This section does not purport to make any new grant, but simply permits the rights of way granted by the act of 1891 to be used for other purposes than that of irrigation. No new class of grantees is described in this section, and to determine who may be entitled to a right of way it is necessary to turn to the act of 1891. There the grantees are described as 'any canal or ditch company formed for the purpose of irrigation.' If it had been intended to enlarge the class of grantees some apt language similar to that of the first section would have been used in this second section of the act of 1898. The controlling idea was still, as in the act of 1891, irrigation."

In the Kern River Company Case, 38 L. D. 302, it was further held:

"A right of way under the act of March 3, 1891, may be acquired only by a company formed for the purpose of irrigation; but a right of way secured under that act may, under the act of May 11, 1898, be used for purposes of a public nature as subsidiary to the main purpose of irrigation. * * *

"While the act of 1898 extended and enlarged the uses which might be made of the rights of way so acquired (under the act of 1891), that act made no provision whatever for the recognition of any other class of grantee, but merely specified the additional purposes for which the rights of way might be used."

Later, in 1910, the attention of the President was directed to the case of the Ramona Power & Irrigation Company for a right of way over lands in the state of California under the provisions of the act of March 3, 1891, in order to obtain an expression of his views as to the policy which should be adopted in cases of applications for rights of way under the act of 1891, as amended by the act of May 11, 1898, where the primary and principal use of the right of way is sought for the purpose of irrigation, but where there is involved a development of electrical power or energy for the purpose of pumping water to lands from streams, reservoirs or wells. The President expressed himself, in the case submitted, as of the opinion that the application should be granted

upon the express condition that the right of way is sought and approved for the main purpose of irrigation, and that the power uses are subsidiary to and mainly for the purpose of serving and carrying out irrigation. 39 L. D. 309. The decisions of the Land Department referred to cover the period from 1894 to 1910. They consecutively antedate the act of 1898, and extend through a period contemporaneous with its enactment and the administration of its provisions. As such, they are entitled to respectful consideration by the courts (United States v. Finnell, 185 U. S. 236–244, 22 Sup. Ct. 633, 46 L. Ed. 890; Midway Company v. Eaton, 183 U. S. 602–609, 22 Sup. Ct. 261, 46 L. Ed. 347); but further than this, as a matter of independent judgment, we concur fully in the views expressed by the officials of the Interior Department. The first section of the act of 1898 has no application in any event, and the second section does not enlarge the class of grantees entitled to the benefits of that act, but merely specifies the additional purposes for which the rights of way, acquired under that act by eligible parties, may be used. Therefore, this act of May 11, 1898, neither enlarges the act of 1891 in such manner as to supersede the act of 1896, nor reinstates sections 2339 and 2340 of the Revised Statutes in so far as those sections have been affected by the act of 1896.

[2] 2. Defendant next asserts that its predecessors acquired an express grant of rights of way for its reservoir and flume or conduit under section 4 of the act of February 1, 1905. This was an act primarily framed to provide for the transfer of forest reserves from the Department of the Interior to the Department of Agriculture. Section 4 (Comp. St. 1913, § 4947) reads as follows:

"That rights of way for the construction and maintenance of dams, reservoirs, water plants, ditches, flumes, pipes, tunnels, and canals, within and across the forest reserves of the United States, are hereby granted to citizens and corporations of the United States for municipal or mining purposes, and for the purposes of the milling and reduction of ores, during the period of their beneficial use, under such rules and regulations as may be prescribed by the Secretary of the Interior, and subject to the laws of the state or territory in which said reserves are respectively situated."

Defendant's position is that this section makes an unqualified grant in the public domain described, which is self-executing and indefeasible during the period of beneficial use. It is stated by counsel that the rules and regulations referred to could not defeat this grant, nor is the right of way in any sense dependent upon them; that the function of the rules and regulations is to control the method of construction and use so as to prevent damage to the forest, etc.; that section 4 of this act was passed to rebut any presumption or claim that rights of way for the storage and conveyance of water could not be acquired upon the forest reserves.

Assuming that this last statement is true, it by no means follows that the rules and regulations contemplated might not prescribe the method and terms of acquisition. While such rules and regulations could not defeat the grant, they obviously could operate to execute and condition it.

Conceding, without deciding, that the term "municipal" is alone enough to cover and embrace all the domestic and other beneficial uses

enumerated in prior acts relating to the same subject, still, in view of the specific and distinctive enumeration of such uses, which the Congress had thought necessary to adopt in such previous legislation, this term can hardly be accorded such a broad significance, unless this act be regarded as a supplement to, rather than a substitute for, what went before; and such it undoubtedly was. There is no reason whatever to regard this act as a departure from the governmental policy on this subject, as evidenced by legislation, beginning at least with the act of 1891 and developing steadily in the direction of governmental control and conservation of the resources of the nation; but, on the contrary, it was more logically a progressive step in the same direction. It follows that all these acts are in pari materia, and should be construed accordingly. At the time defendant's predecessors entered upon the lands in question, they formed no part of the forest reserves of the United States. Prior to the passage of this act, in the view taken by this court, defendant had acquired no vested right in such part of the public domain. It was, in point of law, a mere trespasser, and could not, as against the plaintiff, establish a right by making wrongful entry.

"The mere settlement upon public lands and making improvements thereon without taking some steps required by law to initiate the settler's right thereto, is wholly inoperative as against the United States." Russian-American Co. v. United States, 199 U. S. 570, 26 Sup. Ct. 157, 50 L. Ed. 314; Lake Superior Co. v. Finan, 155 U. S. 385, 15 Sup. Ct. 115, 39 L. Ed. 194; Frisbie v. Whitney, 9 Wall. 187, 19 L. Ed. 668.

The naked terms of the grant did not operate without more to transform an unauthorized entry into a lawful and permanent right of possession. This statute was not self-executing. Rights under it, as disclosed by previous legislation of like nature, must be acquired under such reasonable rules and regulations as may be prescribed by the Secretary of the Interior. This is the only construction permissible under the express terms of the statute itself. The act of February 1, 1905, contains other provisions confirmatory of this view. In addition to the rights granted under section 4, section 2 (Comp. St. 1913, §§ 4947, 5093) authorizes the exportation of wood pulp manufactured from timber in the district of Alaska.

Section 5 (Comp. St. 1913, § 5142) provides:

"That all money received from the sale of any products *or the use of any land or resources of said forest reserves* shall be covered into the treasury of the United States and for a period of five years from the passage of this act shall constitute a special fund available, until expended, as the Secretary of Agriculture may direct, for the protection, administration, improvement, and extension of federal forest reserves."

It was not intended that this part of the public domain should longer be appropriated and used without return to the government, absent express permission by Congress. United States v. Grimaud, 220 U. S. 506, 31 Sup. Ct. 480, 55 L. Ed. 563. Finally, appellant has made no application, and received no permission, either under the act of 1898 or the act of 1905. It can claim no rights under acts with which it has not complied. Mills v. Stoddard et al., 8 How. 345, 12 L. Ed. 1107; United States v. Utah Power & Light Company (C. C. A.) 209 Fed. 562, 126 C. C. A. 376. It will be seen, by reference to the opinion, that both

these acts were before this court on the former appeal.   It was not thought then, and is not thought now, that they were intended to, or do, impair the governmental policy announced in the act of 1896.

[3]   3.  But the defendant insists that the land of the plaintiff within the state of Utah is, in any event, subject to the laws of that state and its power of eminent domain; that those laws authorize the defendant and its predecessors to construct and maintain its reservoirs and flume or conduit upon the plaintiff's land.   It bases its contention upon the generally accepted propositions that each state of the union is an independent sovereign and has all the rights and powers of such, except as they may be restricted or limited by the federal Constitution, whereas the government of the United States is said to be one of delegated, limited and enumerated powers; that the right of eminent domain is an attribute of sovereignty; that section 3 of article 4 of the federal Constitution, providing that "Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States," is not a grant of power by the states to the United States, but is, however, a grant of power to Congress as a branch of the federal government.   The reasoning upon which this conclusion is based is thus stated in the brief:

"The states never had the power to control or dispose of property of the United States (except that each state had the right to take property within its jurisdiction for a public purpose).  The territory of the United States was not within the states.  As soon as this was ceded to and became the property of the United States, the power of control and disposition necessarily passed to the United States.  There was no occasion in the Constitution for any express grant to the United States of power to control and dispose of its own property.  Such power existed as soon as the new political entity was created by the Constitution.  This clause is, however, a grant of power to Congress.  It designates Congress as the branch of the federal government which can exercise the power of control and disposition which the United States holds inherently as the owner of the property."

An inconsistency in this argument is at once apparent.   If section 3 of article 4 of the federal Constitution is not to be interpreted as a grant of power by the states to the United States, for the reason that the states never had power to control or dispose of the property of the United States, and could not, therefore, presumably grant away a power which they did not possess, it is, by the same token, difficult to perceive how that clause can, nevertheless, be regarded as a grant of power to Congress.   It was also suggested at the argument that the land in question was not embraced within any territory in contemplation by the framers of the Constitution.   This entire line of argument is special pleading, false in premise, and unsound in logical sequence. The government of the United States is in a sense one of delegated, limited and enumerated powers, and such powers as are not delegated to it by the Constitution, nor prohibited by the Constitution to the states, are reserved to the states respectively, or to the people.   But the clause in question is no less a delegation of express power to the federal government because it is abstract and general rather than concrete and specific.   The states were forming for themselves and their successors a central government which should be supreme within a

defined jurisdiction. This clause is sufficiently broad to cover not only conditions then existing, but all future expansion and development. It is a distinction, without a difference, to say that it embodied a grant to the Congress, but not to the government itself. The Supreme Court has held that it is a grant of power to the United States of control over its property. Kansas v. Colorado, 206 U. S. 89, 27 Sup. Ct. 655, 51 L. Ed. 956; Light v. United States, 220 U. S. 523–537, 31 Sup. Ct. 485, 55 L. Ed. 570; United States v. Utah Power & Light Company, 209 Fed. loc. cit. 557, 126 C. C. A. 376, and cases cited.

It is true that in some of the earlier decisions the validity of the exercise of the right of eminent domain by a state over the lands of the United States has received apparent recognition. United States v. Railroad Bridge, 6 McLean, 517, 531, 533, Fed. Cas. No. 16,114; United States v. City of Chicago, 7 How. 185, 12 L. Ed. 660; Illinois Cent. R. Co. v. Chicago, B. & N. R. Co. (C. C.) 26 Fed. 477; Union Pac. Ry. Co. v. B. & M. R. R. Co. (C. C.) 3 Fed. 106; Union Pac. Ry. Co. v. Leavenworth, N. & S. Ry. Co. (C. C.) 29 Fed. 728; Jones v. Florida C. & P. R. Co. et al. (C. C.) 41 Fed. 70. This view is predicated upon the assumption that while government lands are not reserved or held for specified national purposes, the United States occupies the position of a mere individual proprietor, with rights and remedies neither less nor greater. An examination of the cases cited, however, discloses that the peculiar facts with which they dealt, as well as the limitations stated in the opinions written, greatly modify the scope of the doctrine stated; and the later cases leave little doubt that the Supreme Court has not recognized, and will not recognize, the limited control of Congress over the territory and property belonging to the United States, for which defendant contends. The public lands of the United States are held by it, not as an ordinary individual proprietor, but in trust for all the people of all the states to pay debts and provide for the common defense and general welfare under the express terms of the Constitution itself. It matters not whether the title is acquired by cession from other states, or by treaty with a foreign country, whether the lands are located within states or in territories, they are held for these supreme public uses when and as they may arise. The Congress has the exclusive right to control and dispose of them, and no state can interfere with this right or embarrass its exercise. United States v. Gratiot, 14 Peters, 526, 10 L. Ed. 573; Pollard v. Hagan, 3 How. 212, 11 L. Ed. 565; Irvine v. Marshall, 20 How. 558, 15 L. Ed. 994; Gibson v. Chouteau, 13 Wall. 92–99, 20 L. Ed. 534.

"The means employed by the government of the Union are not given by the people of a particular state, but by the people of all the states; and being given by all, for the benefit of all, should be subjected to that government only which belongs to all. All subjects over which the sovereign power of a state extends are objects of taxation; but those over which it does not extend are, upon the soundest principles, exempt from taxation. The sovereignty of a state extends to everything which exists by its own authority, or is introduced by its permission; but does not extend to those means which are employed by Congress to carry into execution powers conferred on that body by the people of the United States." Van Brocklin v. State of Tennessee, 117 U. S. 151–155, 6 Sup. Ct. 670, 672, 29 L. Ed. 845.

Moreover, the act enabling the people of Utah to form a Constitution and state government imposes the condition that the people inhabiting said proposed state forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof. In the Constitution of Utah, subsequently adopted, this provision was incorporated in terms. It is urged that insistence upon these terms, when the new state of Utah was admitted, implies that the exclusive control of Congress was conceived not to exist in the absence of such an express reservation; but the better view is that the expression in the Enabling Act, and in the Constitution of the new state, was but declaratory of a constitutional power known to exist, and was inserted to forestall all possible contention. Van Brocklin v. Tennessee, 117 U. S. 167, 6 Sup. Ct. 670, 29 L. Ed. 845; Stearns v. Minnesota, 179 U. S. 223, 21 Sup. Ct. 73, 45 L. Ed. 162. It is idle to insist that the provisions of the Utah Enabling Act and Constitution do not interfere with defendant's contentions. In the brief counsel say:

"They did not provide that the land should remain 'at the sole and entire disposition of the United States,' but merely provided that it should remain 'subject to the disposition of the United States.'"

This is a distinction without a substantial difference. The acquisition of a perpetual easement under the alleged power of eminent domain is such an appropriation as amounts to an invasion of the constitutional power of Congress.

"The power to tax" (as the power to take) "involves the power to destroy; the power to destroy may defeat and render useless the power to create; and there is a plain repugnance in conferring on one government a power to control the constitutional measures of another, which other, with respect to those very measures, is declared to be supreme over that which exerts the control. The states have no power, by taxation or *otherwise*, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government." Van Brocklin v. State of Tennessee, 117 U. S. 155, 156, 6 Sup. Ct. 670, 673, 29 L. Ed. 845.

The United States does not and cannot hold property as a monarch may for private or personal uses; it cannot hold as a private proprietor for other than public objects. Van Brocklin v. State of Tennessee, 117 U. S. 158–161, 6 Sup. Ct. 670, 29 L. Ed. 845. "All the public lands of the nation are held in trust for the people of the whole country." United States v. Trinidad Coal Co., 137 U. S. 160, 11 Sup. Ct. 57, 34 L. Ed. 640; Light v. United States, 220 U. S. 523–537, 31 Sup. Ct. 485, 55 L. Ed. 570.

The United States can prohibit absolutely or fix the terms on which the property may be used. As it can withhold or reserve the land it can do so indefinitely. Light v. United States, 220 U. S. loc. cit. 536, 31 Sup. Ct. 485, 55 L. Ed. 570; Stearns v. Minnesota, 179 U. S. 243, 21 Sup. Ct. 73, 45 L. Ed. 162. In Coe v. Errol, 116 U. S. 517–524, 6 Sup. Ct. 475, 477, 29 L. Ed. 715, Mr. Justice Bradley said:

"We take it to be a point settled beyond all contradiction or question that a state has jurisdiction of all persons and things within its territory which do not belong to some other jurisdiction, such as the representatives of foreign governments, with their houses and effects, and property belonging to or in the use of the government of the United States."

230 F.—22

And in Van Brocklin v. Tennessee, 117 U. S. loc. cit. 165, 6 Sup. Ct. 670, 29 L. Ed. 845, Mr. Justice Gray quotes approvingly the following language of Mr. Douglas in which Mr. Webster concurred:

"The title of the United States can be divested by no other power, by no other means, in no other mode, than that which Congress shall sanction and prescribe. It cannot be done by the action of the people or Legislature of a territory or state."

To hold otherwise—

"would tend to create a conflict between the officers of the two governments, to deprive the United States of a title lawfully acquired under express acts of Congress, and to defeat the exercise of the constitutional power to lay and collect taxes, to pay the debts and provide for the common defense and general welfare of the United States."

The rights of the states in the shores and beds of navigable waters below high-water mark bear no analogy to the claim of defendant here. In such cases the government asserts not title, but control over navigation. United States v. Chandler-Dunbar Water Power Co., 229 U. S. 53, 33 Sup. Ct. 667, 678, 57 L. Ed. 1063. The distinction is clearly drawn by the Supreme Court in Van Brocklin v. Tennessee, 117 U. S. 167, 168, 6 Sup. Ct. 670, 29 L. Ed. 845:

"Upon the admission of a state into the Union, the state doubtless acquires general jurisdiction, civil and criminal, for the preservation of public order, and the protection of persons and property, throughout its limits, except where it has ceded exclusive jurisdiction to the United States. The rights of local sovereignty, including the title in lands held in trust for municipal uses, and in the shores of navigable waters below high-water mark, vest in the state, and not in the United States. New Orleans v. United States, 10 Pet. 662, 737 [9 L. Ed. 573]; Pollard v. Hagan, 3 How. 212 [11 L. Ed. 565]; Goodtitle v. Kibbe, 9 How. 471 [13 L. Ed. 220]; Doe v. Beebe, 13 How. 25 [14 L. Ed. 35]; Barney v. Keokuk, 94 U. S. 324 [24 L. Ed. 224]. But public and unoccupied lands, to which the United States have acquired title, either by deeds of cession from other states, or by treaty with a foreign country, Congress, under the power conferred upon it by the Constitution, 'to dispose of and make all needful rules and regulations respecting the territory or other property of the United States,' has the exclusive right to control and dispose of, as it has with regard to other property of the United States; and no state can interfere with this right, or embarrass its exercise. United States v. Gratiot, 14 Pet. 526 [10 L. Ed. 573]; Pollard v. Hagan, 3 How. 212 [11 L. Ed. 565]; Irvine v. Marshall, 20 How. 558, 563 [15 L. Ed. 994]; Gibson v. Chouteau, above cited."

It has been thought advisable and necessary to carry this discussion to somewhat unusual length because of the importance of the question involved, the earnest insistence of counsel upon the right asserted, and the absence of an express ruling by the Supreme Court thereon. In United States v. City of Chicago, 7 How. 185, 12 L. Ed. 660, the proposition was not decided because "open to some debate" and "not necessary to a disposition of the case." In Van Brocklin v. Tennessee, supra, it was announced:

"When that question shall be brought into judgment here, it will require and will receive the careful consideration of the court."

In Siler et al. v. Louisville & Nashville R. R. Co., 213 U. S. 175, 29 Sup. Ct. 451, 53 L. Ed. 753, it was said that:

"Where a case in this court can be decided without reference to questions arising under the federal Constitution, that course is usually pursued and is not departed from without important reasons."

The same considerations moved this court upon the last appeal to refrain from making an express determination of this point, although then suggested, as being unnecessary to a disposition of the case. Now, however, the question is squarely presented and we answer it without hesitation. In our opinion, the public lands involved were not subject to state power of eminent domain, either directly or indirectly, without the consent of the United States; and to sustain its contention, the defendant must point to some express grant by the government, or at least to subsisting legislation from which the grant may be inferred, or by which its claims have been recognized and preserved. United States v. Utah Power & Light Co. (C. C. A.) 209 Fed. loc. cit. 559, 126 C. C. A. 376. In this view, it is unnecessary to consider whether there has been any effective exercise of the power claimed.

[4] 4. We come now to the defense of equitable estoppel. This is predicated upon the view that with respect to its proprietary interests a sovereign is subject to the principles of equitable estoppel in the same manner and under the same circumstances as a private individual or corporation. By its amended answer defendant alleges that its works were constructed at very great expense, and with the presumed knowledge of the plaintiff through its agents and representatives; that for nine years plaintiff neither objected to nor protested against the use of its land; that to enjoin the maintenance and operation of the works will cause serious loss to the defendant and great inconvenience to the public.

It should be observed, in passing, that while the decree below quieted title in complainant and embraced an injunction against the defendant, nevertheless this situation was the direct result of defendant's insistence upon the rights for which it now contends. The bill of complaint did not seek to expel the defendant from the public domain, but prayed that it should be enjoined from maintaining its alleged unlawful possession and occupancy without the permission of plaintiff, and without first complying with the laws of the United States, and the rules and regulations promulgated by the Secretary of Agriculture relating to national forests, and further that defendant be required to make pecuniary payment to the plaintiff for use and occupation. The government has not refused a right of way over its lands for the beneficial uses in question. The issue of interrupted service and great inconvenience and hardship to defendant's customers, and to the public generally, is not legitimately in this case, although persistently urged. The government has shown no disposition to deal unjustly with the states nor with their citizens in this respect, and it is not to be expected nor presumed that it will do so. United States v. Utah Power & Light Co., 209 Fed. 554–559, 126 C. C. A. 376; Stearns v. Minnesota, 179 U. S. 223–243, 21 Sup. Ct. 73, 45 L. Ed. 162. The only question here presented is whether a public service corporation, assuming to act in the name of the state of Utah, shall receive a free and permanent right of way and capitalize that gratuity for private gain,

or whether the United States shall control the disposition of its property and receive fair compensation as other landed proprietors for the use thereof. If the exigencies of this particular community are such that the interests of the people demand public grants and concessions for their necessary comfort and convenience, no doubt such will be made, as they always have been made, by government, state and national, but they must flow from congressional action and not from individual appropriation.

It is well settled that an unauthorized or wrongful entry upon public lands, and the making of improvements thereon, without taking the steps required by law to initiate a legal right thereto, is wholly inoperative as against the United States. Russian-American Co. v. United States, 199 U. S. 570, 26 Sup. Ct. 157, 50 L. Ed. 314; Frisbie v. Whitney, 9 Wall. 187, 19 L. Ed. 668; Lake Superior, etc., Co. v. Finan, 155 U. S. 354, 15 Sup. Ct. 115, 39 L. Ed. 194; United States v. Trinidad Coal & Coking Co., 137 U. S. 160, 11 Sup. Ct. 57, 34 L. Ed. 640. Long acquiescence does not legalize an unwarranted appropriation. Camfield v. United States, 167 U. S. 527, 17 Sup. Ct. 864, 42 L. Ed. 260. And failure to object does not confer any vested right as against the government. Light v. United States, 220 U. S. 523–535, 31 Sup. Ct. 485, 55 L. Ed. 570; Steele v. United States, 113 U. S. 130, 5 Sup. Ct. 396, 28 L. Ed. 952; Wilcox v. McConnel, 13 Pet. 513, 10 L. Ed. 264.

It is equally well settled, and is, in fact, conceded, that laches is not imputable to the government, and, as stated in United States v. Kirkpatrick, 9 Wheat. 720–735, 6 L. Ed. 199:

"This maxim is founded, not in the notion of extraordinary prerogative, but upon a great public policy. The government can transact its business only through its agents; and its fiscal operations are so various, and its agencies so numerous and scattered, that the utmost vigilance would not save the public from the most serious losses, if the doctrine of laches can be applied to its transactions. It would, in effect, work a repeal of all its securities."

The defendant admits the soundness of this principle, but makes a distinction between laches, or mere delay, and equitable estoppel as resulting from the showing made by its answer, to which reference has been made. Reliance is placed in great measure upon New York City v. Pine, 185 U. S. 93, 22 Sup. Ct. 592, 46 L. Ed. 820, in which it was held:

"A failure to pursue statutory remedies is not always fatal to the rights of a party in possession, and if full and adequate compensation is made to the plaintiff, sometimes the possession of the defendant will not be disturbed."

In that case the municipality was undertaking a large work with a view of supplying its citizens with water. It had been engaged in this work for two years and had nearly completed its dam. Before the case was brought the plaintiffs and the city had been trying to agree upon the amount of compensation, and the former were seeking compensation for the injuries they would sustain, and were not insisting upon their alleged right to an abandonment of the work. In such case it was held that the city might well assume that payment of a just

compensation would be accepted in lieu of the right. The power of eminent domain was conceded. The plaintiffs were held to be estopped from insisting upon an abandonment of the work inasmuch as adequate compensation might be ascertained and decreed.

Our attention is also directed to the decisions of this court in State of Iowa v. Carr (C. C. A.) 191 Fed. 257, 112 C. C. A. 477, and Hemmer v. United States (C. C. A.) 204 Fed. 898, 123 C. C. A. 194, wherein it was held that in a suit in equity the claims of the United States appeal to the conscience of the chancellor with the same, but with no greater or less, force than those of a private individual under like circumstances, and are determinable by the same rules and principles. In the former of these cases one Samuel Carr and others brought suit against one Charles R. Hannan, etc., to quiet the title to certain land on the Iowa shore of the Missouri river. The state of Iowa intervened and sought to establish its claim to a part of this accreted tract on the ground that it was appurtenant to an island on the Iowa part of the river bed, and, in fact, was the Iowa part of the abandoned bed of the river. In opposition to this claim complainants set up long continuous adverse possession; that the land was an accretion to their own lands, to which they held title from the United States; and further that the state had long acquiesced in their title and possession and had recognized it affirmatively by the levy and collection of taxes upon the disputed land as the property of the complainants. For more than 20 years the plaintiffs and their grantors were in undisturbed possession of the land under claim of title. They expended large sums of money on its improvement. The state, with full knowledge of the situation, listed the property as theirs and levied and collected taxes from them.

In Hemmer v. United States, supra, one Henry Taylor, an Indian, entered 160 acres of land in South Dakota, made his final proof, paid for the land, and obtained his final receiver's receipt under the act of Congress of March 3, 1875 (18 Stat. 420, c. 131, § 15 [Comp. St. 1913, § 4611]), which provided that any Indian who was the head of a family, or who had arrived at the age of 21 years, and had abandoned, or should thereafter abandon, his tribal relations, should be entitled to the benefits of the homestead law, but that the title to the land he should acquire should be inalienable for five years from the date of his patent therefor. In 1884, after he had completed his five years of residence and occupation of his homestead, and thus had completely earned it, a law was passed providing that the government would hold such land in trust for 25 years instead of 5. By mistake, the patent, which was issued to him, contained this provision of the later act. Afterwards the title passed from Taylor to Hemmer. The United States brought suit in equity against the immediate and remote grantees of Taylor, for the purpose of setting aside all the conveyances under which they held, upon the ground that this homestead was inalienable for 25 years after the date of the patent issued under the act of 1884 (Act July 4, 1884, c. 180, 23 Stat. 96 [Comp. St. 1913, § 4612]). In the course of the opinion the doctrine was restated that in such a suit the claims of the government appeal to the conscience of the chancellor with the same, but with no greater or less, force than those of a private individual under

similar circumstances. However, the court held that the act of 1884 did not repeal, amend or modify any of the provisions of the earlier act, and did not extend from 5 years to 25 years the restriction on alienation; that Taylor had fully complied with the prior act, had all rights under it and that Hemmer stood in his shoes. Under this holding, the disposition of the case did not depend upon the doctrine of equitable estoppel quoted.

Nevertheless, there can be no doubt that situations may be and are presented where both state and nation enter courts of equity as suitors under conditions which place them upon an equal footing, in this respect, with the private citizen; that where the relations existing are such as to convey actual knowledge of and acquiescence in asserted claims under conditions which would make the subsequent denial of such claims inequitable, the doctrine of equitable estoppel as distinguished from mere laches may be invoked even against the government. The cases just cited are examples of such, but their doctrine cannot be so far extended as to validate the unauthorized appropriation of the public lands upon the mere ground of occupation and improvements made, the knowledge of which is presumed to be brought home to the government through "fiscal operations so various, and agencies so numerous and scattered, that the utmost vigilance would not save the public from the most serious losses if the doctrine of laches can be applied to such transactions." The doctrine of equitable estoppel has no application here.

[5] It remains to consider the contention of the government upon its cross-appeal, viz. that the courts should have decreed an accounting and damages as prayed. We are unable to perceive why that contention is not sound, and this notwithstanding the lands have not been injured and would not, perhaps, have been otherwise leased or used by the government during the same period. United States v. Bernard (C. C. A.) 202 Fed. 728–731, 121 C. C. A. 190; St. Louis v. Western Union Telegraph Company, 149 U. S. 465, 13 Sup. Ct. 990, 37 L. Ed. 810. It would seem further that the charge imposed by the regulations should fairly and reasonably measure the value of such use. Congress clearly has the power to prescribe the terms upon which it will permit the lands of the United States to be used or otherwise disposed of; and the authority to make such rules conferred upon executive officers is not a delegation of legislative power.

"A provision in an act of Congress as to the use made of moneys received from government property clearly indicates an authority to the executive officer authorized by statute to make regulations regarding the property to impose a charge for its use." United States v. Grimaud, 220 U. S. 506, 31 Sup. Ct. 480, 55 L. Ed. 563; Cosmos, etc., Co. v. Gray Eagle Oil Co., 190 U. S. 301, 23 Sup. Ct. 692, 24 Sup. Ct. 860, 47 L. Ed. 1064.

By the act of 1896 the Secretary of the Interior is expressly authorized to permit the use of such rights of way under general regulations to be fixed by him. It follows that the decree of the trial court quieting and confirming the title to the lands in question, as against all claims, demands and contentions of the defendant, and enjoining said defendant from further operating the said works without the permission of the plaintiff, and from further maintaining its unlawful and tortious

possession and occupancy within the Cache National Forest without the permission of plaintiff, and without first complying with the laws of the United States and the rules and regulations promulgated by the Secretary of Agriculture relating to national forests, must be affirmed, but the cause will be remanded to the district court for an accounting for the reasonable value of use and occupation and for such other proceedings as may be necessary in accordance with the views herein expressed.